Good morning, Your Honors. May it please the Court, my name is James Angel, appearing on behalf of the Wilderness Society et al. This case presents fundamental questions regarding what it means to be a national monument and what sort of protections are afforded these unique landscapes. This case presents this question in the starkest of fashions because BLM admits in its EIS that vehicle use on the monument will cause readily apparent changes to the very character-defining features of cultural objects in the monument. These are such as burial sites, rock art, old villages, watchtowers. Some of this is hundreds and even thousands of years old. These are unique and, as the proclamation stressed, irreplaceable resources. But BLM's plan allows substantial harm to the very resources that motivated the creation of the monument to begin with. Is it your position that all vehicle use should be eliminated? Oh, absolutely not, Your Honor. Because the monuments wouldn't be of much use to the people of the United States if they couldn't go there. I absolutely agree, and we don't think that's necessary in the least. And there's ways of – certainly to protect an object doesn't lead to the sort of absurdities that BLM considers. There are things such as de minimis impacts that could be worked around. Some of the cultural objects – I don't think it really helps to label the BLM as absurd. Oh, no, I'm sorry, Your Honor. They may be in error. They may not agree with you. But to say they're absurd allows us to find that you're wrong by finding any reason whatsoever. I'm sorry, Your Honor. I didn't mean they were being absurd. I was suggesting that they were suggesting that our position that objects have to be protected is an absurd result because it would lead to the entire exclusion of folks. So I was characterizing BLM's view of our argument, that we were being absurd. So my apologies if that wasn't clear. The proclamations don't say protect some objects. They don't say, BLM, you pick and choose which objects to protect. It says protect the objects. And the proclamations don't allow, on the face of it, those – that protection to be balanced off against other uses. So you're – you think that the holistic approach that the BLM used is not permitted under the statute? That's correct, Your Honor. We believe it's incompatible. Now, the holistic approach, which they hit upon late in the process in response to comments – I'm actually hard-pressed to figure out exactly what it means. It's on page – excerpts of Record 431. It says that the management goals or plans include goals that recognize important relationships and interdependencies among the listed objects and the natural and cultural districts of which they are a part. I'm not sure exactly what that means on the ground. But what it plainly means in terms of the management is that some of the objects can be impacted. And if you look at supplemental –  Are you talking about specific objects being impacted? Or are you talking about generally objects that are going to be impacted? Well, Your Honor, it's – it's a little bit – There is nothing specific is what you're telling me. Well, they say that there are specific objects that will be impacted. In fact, they say at the supplemental excerpts of Record 10, they say – And you've looked at it, haven't you? You've looked at their plan, and you don't find that there's much of an impact. No, that's not so, Your Honor. Their plan acknowledges impacts. It says that there will be readily – I know it does. And which specific object is impacted? Your Honor, the problem is their plan does not offer the sort of fine-grained assessment, and I think that's because they offer this holistic view. It doesn't say, here are specific objects, here's how we're going to manage them, here are the most important ones, maybe we'll run the routes around it a little bit, maybe we'll accommodate it. That's the sort of thing that should have happened, but it didn't happen. And that's – that is really based on their holistic view. They are not running a six-lane highway through it. Is that correct? They're in those six-lane highways, Your Honor. Right? So you know that. Indeed. Okay. Indeed. Now, they're running a dirt track. That's correct. Many of them are dirt tracks, and we have a problem with that, of course. Many, many of them are dirt tracks. That's correct, Your Honor. And, in fact, some of the dirt tracks which exist there now are being closed. Is that correct? Some are, Your Honor. Fair amount. Indeed. Indeed. And you're objecting to which turn in the dirt tracks affecting which objects? Your Honor, again – Or are you just objecting to the whole thing? We are objecting to the organizing principle at which they looked at that management plan, which led them to not provide the sort of detailed information that would answer Your Honor's question. And that was a problem for us as well. Now, there was a – But that means you didn't go out and look. No. In fact, Your Honor, there was a – the Bungert study that did go out and look. It documented in just a very short time a whole host of cultural sites that were being impacted – impacted by roads. So it's not as if it didn't happen. It did happen. It's an endemic problem. BLM admits it's a – that it occurs, that this degradation occurs. And they said we don't have to worry about it because we have this holistic theory that says we really don't have to protect all of the objects. So it's your position that a proper document would have said these are the detriments that will occur to these monuments through this action? I think that would have been a much more proper NEPA analysis. It would have showed what the actual impacts of their action are. And I think it would have been true to the proclamation that says you shall adopt a Again, that doesn't mean setting – it's not a museum piece. It doesn't mean setting things aside. That really is the starting point. One of the problems I've had with this is trying – and it's, you know, back to law school, the slippery slope, places to draw the line. And one place to draw the line is kind of at the edge. Protect means protect everything. The trouble is human contact starts to degrade from the get-go. And so you really acknowledge to Judge Bey, you're not trying to wall this territory off. So the problem becomes, okay, you're not satisfied with what you view as amorphous, holistic approach being offered by the Bureau. What more specifically is a stopping point for the protection that doesn't get to be walling it off from everybody? And that's – I've struggled to try to figure out where that is. We're struggling with it as well. It's a difficult problem. What we have on one end of the spectrum is BLM saying we don't have to protect all the objects. We can get by just protecting some. We don't know which ones, but some. And they acknowledge that others will be harmed. We're saying, no, you really do have to protect them. But there is a middle ground. We're not saying you have to protect them under glass. You can go out and look at, okay, which ones will be impacted to really a de minimis degree. Which are the most important ones? There may be a sliding scale of how they have to be, the degree to which protections might need to be afforded. Maybe a sign does it. Maybe rerouting the road does it. That's the sort of hard work that BLM should have been doing in this plan, figuring out how do we protect these objects. So you want an inventory of the monuments, and then you want a prediction of the deterioration through human contact through different modalities, and then you want limitations on those modalities. Well. One, two, three. Well, Your Honor, it's a tall task to provide an entire inventory right from the get-go. But really what they're doing is we're talking really about ORV routes. You don't have to look at the 1.3 million acres. You have to look at what is along the routes that we're looking at. And if you identify cultural features along those routes, yes, then BLM has to decide what is necessary to protect those from harm. And I think it's not just the harm of breathing on it and disturbing a few molecules, but remember the organizing principle of the underlying feature of the Antiquities Act is to preserve their historical and scientific significance. So that is a – it's something of a standard to be applied. And that's the sort of thing BLM should have done. What it can't do is just say we don't have to protect everything. We can let some things go, and we get to pick and choose. That's what we think is impromptu. As I understand it, the designation as a national monument is meant to protect deterioration beyond the deterioration that's happened to date. If they're not proposing to expand, not building more roads, the issue really has to do with what do you do with the roads slash trails, the access that currently exists. If they're not expanding it, are there – what is it that requires them to expand the protections or make even more limited the access that currently exists? The rationale behind the Antiquities Act is that in the future, or perhaps the near future, maybe the far future, these resources are imperiled, and they need protection. Now, they're still there. They're worth protecting. So what's happened up to this point hasn't destroyed them altogether, but we're worried about the direction things are going in. And in this case, there's expanding visitorship, expanding off-road vehicle use, and expanding nearby population. And those are the sort of future impacts that the Monument Proclamation was supposed to deal with up front, and that's why it was worth setting out to begin with. So status quo management, maybe it's been sufficient up until now to a degree, but the idea is it's not going to be sufficient in the future, and that's why it deserves a national monument protection. Was there anything in the proclamations themselves which set forth a system by which a monument should be, quote, inventoried and protected against specified threats? No. Proclamations are broader documents than that, Your Honors. You'll see the proclamations are only a couple pages. What is the basis of your saying that the Historic Preservation Act is applicable? Is that the proclamation or just the act? No, I say that in the Antiquities Act. Antiquities Act. The Antiquities Act purpose, it says, or what it enables the President to do is to set aside areas for their historic and scientific interest. And the proclamation does that. But it doesn't give you detailed regulation about how you're going to do each road. What it says is protect these objects. Does the proclamation invoke the Antiquities Act? Yes, it does. It was empowered by the Antiquities Act. The President was acting pursuant to the Antiquities Act. Before I leave this, I just want to speak to deference briefly. Chevron deference is due when an agency actually applies its expertise in consideration to a question. There's no evidence that BLM took a step back and said, okay, how does this holistic management approach fit with the Antiquities Act? So there's no Chevron deference due in that respect. Let me turn to the minimization criteria. Now, these are a set of criteria that BLM must consider for off-road vehicle routes. This imposes not just a procedural duty to consider these factors, but a substantive duty to locate the routes to minimize the impacts. Now, the principal, if not only, tool that used to do that was this jellyfish-looking thing, the decision tree. It's on page 477 of the excerpts of the record. There are several fundamental problems that have doomed the use of that tree in other cases and should do so here. One is that at least two of the criteria are never considered, air and noise. And the other is that depending on how you answer several of the questions, the criteria that are considered in the tree can be skipped. Really, to understand the tree, you have to look at Appendix 2T. That actually tells you what's being asked in each of the questions. And so you have to look at excerpts. Scalia. I'm not understanding why air and noise would affect the monuments. Rosenkranz. Air and noise, Your Honor? Those are two of the factors that the criteria imposes. Scalia. So there's a monument, there's a big bluff, beautiful big bluff. How does air and noise affect that? Rosenkranz. Well, the idea is that it's not only affecting the monument, but it's affecting other visitors. This regulation, Your Honor, applies not just to monuments, but to all BLM lands. So even if this was not a monument, this regulation would apply. Scalia. How does it affect burial sites, air and noise? Rosenkranz. Again, Your Honor, it's not about the impacts to the monument objects, this claim. The air and noise is really about impacts to other visitors. So that's what this goes to. This one isn't monument-dependent. It isn't monument-dependent at all. I just want to point out that, again, as we tried to set out, it's very difficult to follow, I acknowledge. But the vast majority of the minimization criteria are asked in questions. It's labeled on that horrible graph, questions E, I, and K. But the problem is that I just go to appendix 2T. I couldn't cope with the Appendix 2T, you have to look at appendix 2T, as a matter of fact. But the point is, if you answer the prior question, that is question B, F, and G, across the top, if you answer that yes, then the whole question of the next tier question, where all the monument criteria are, or the minimization criteria are asked, gets skipped altogether. Now, BLM has suggested no matter if it gets skipped, those routes are all going to be closed anyhow. It's totally superfluous. That's just wrong as a matter of fact. If you follow down the tree, those routes can be open, regardless of the fact that the minimization criteria are never considered. And we've given one example of a route that stayed open. I have a number of others at, at surface of record, 568, 559, 562. Mr. Angel, the take of the response of the BLM is that the root evaluation tree was not the only tool that they used. They also considered the impacts of air and noise in the environmental impact statements. That is their argument, Your Honor, and that's two problems with that. The environmental impact statement discussion of particularly air says, well, first of all, it's on a the minimization criteria apply on a route-by-route basis. The environmental impact statement doesn't do that at all. It looks on a much broader sort of global level. It never really looks at each individual route. And what it does say about air is that the problems would be localized. Well, that's exactly the problem. You should be looking at them on a route-by-route basis. And then the other problem, Your Honor, is that a NEPA document is purely a procedural document, and this imposes a substantive duty, not just a procedural duty, as those district court cases that we cited pointed out. They also say that these other criteria are considered elsewhere in the process, and they name all the process, but Your Honors could look throughout that process and nowhere are the missing criteria discussed. They point, for example, to the route evaluation reports. A number of those are in the record. But those just really report the answers to the trees questions. It doesn't ask the missing questions. So when you look closely, the minimization criteria, all of them are not considered. One last point I'd like to make. This is about the wilderness settlement claim. For decades, Bureau of Land Management has been applying a particular protective set of management standards. It's called the non-impairment standard. It's set out in a document called the IMP. In 2003, the BLM entered a settlement with the State of Utah that said it no longer had the power to impose that. That was a misinterpretation of FLIPMA, and so that goes to that misinterpretation both should serve to invalidate that agreement as well as invalidate BLM's failure to consider the an alternative in this case that applied the stringent protections that have been enjoyed by hundreds of similar lands in the past elsewhere in the country. Unless Your Honors have further questions, I'll reserve my last couple of minutes of time. Thank you. May it please the Court, my name is Ellen Durkee. I'm with the U.S. Department of Justice, and I represent the Bureau of Land Management. This Court should affirm the District Court judgment upholding BLM's decisions, approving the resource management plans, and route designations for the Grand Canyon, Parashant, and Vermilion Cliffs National Monuments, both of which are located in the Arizona Strip of northern Arizona. These monuments encompass an area of over 1.3 million acres. That is an area that is larger than either the states of Rhode Island or Delaware. The historical, archaeological, geological, and wildlife resources which prompted the monuments creation in the year 2000 had remained preserved in large part because of the very limited road access in this area, and under the resource management plans that are challenged in this case and road designation decisions, that road access will be rolled back, and so there will be less road access. Less road access in terms of the roads, what about in terms of the usage? And part of the concern here is that there is population growth in the area, and you may have more usage of the existing roads or trails. There's two answers to that. First of all, this area has historically been very lightly used, and therefore even a small gain is still very small usage. The other thing that is part of the plan is that there is ongoing monitoring, and even already where they have, because they don't necessarily know where recreational users will choose to go, and I know in the Vermilion Cliffs, for example, which is very popular because it's very beautiful, for hikers and so on, where their monitoring has decided that there's too much recreational use in a particular area, then they have now gone to a permit system that limits the access there. So there are management tools within this management plan to address this very issue. Closing roads is not the only way to deal with issues of concentration. The other thing about this plan is that it's trying to strike a balance, and I think that's entirely appropriate, and I'll show you that in a minute, but the balance is that the most remote areas, which are the large bulk of the monuments, are being kept without roads into them, and where the road access has been retained are areas that are nearer where there are private end holdings, state end holdings, grazing use, or the more areas that historically have been used for recreational users. The question, sort of this overarching question that Mr. Angel started with, I think I'd like to address that first, because as I understand their argument, they are not saying that the proclamations mean that you cannot negatively impact a single fossil or a single lithic artifact, and so once we have some agreement on that, and I think it's fairly obvious that's not what was intended by the proclamations, they retain grazing use, they retain valid existing rights, I think everyone agrees that you don't want to bar the public's enjoyment of an ability to see these wonderful vistas. I don't think anyone would think that was the intention. So once you get to there, then the question becomes, okay, we've got a scale of how much that we're on, and they would like the balance to be struck over here and to be struck at here, but ultimately this is an issue that the management agency must strike that balance. It's not much a matter of balance, but I see it as a matter of the structure of the analysis for the balance. If I understood Mr. Angel correctly, he was challenging the BLM's adoption of a holistic approach to the issue of preservation versus deterioration. And my question would be, on one hand we have, I think what he is arguing for, which is a specific listing of the monuments and a specific consideration of the deterioration which human use would allow, would cause. And your position is, no, we deal with that holistically. Where in the proclamations or in the law or in the regulations is the BLM permitted to make this assessment on a, quote, holistic, unquote, basis? Could you point that out to me? Yes. I'm going to stay away from the word holistic because I'm really not sure what that sentence means either. I think what they're talking about. The sentence that you used? The part that I said what I believe that their argument is. I mean, what is it? It must be. Ms. Durkee, would you kindly point to me any statutory, regulatory, or proclamation authority for the use of the term holistic? There is. That word does not appear in. It came out of the imagination of the BLM. It comes out of resource management planning structure in FLPMA. One of the things that they're complaining about is that this plan is a framework, but that's exactly what is intended under the FLPMA planning process. You have these resource management plans that give broad direction. These are followed then by site-specific activities in implementing the plan, in which case there is another round of review. And this is typical of whether it's, you know, a forest service area, a monument area, or whatever the area is. So part of what they're complaining about is actually the way land management planning is structured. The reason I'm just going to try to say this as an aside, ordinarily environmental groups are interested in holistic planning that be included, maybe not exclusively, because they want to look at interrelationships of ecosystems, and that's typically what that is meant. What they're complaining about is the notion that some cultural resources may be impacted by the roads. And what they keep going back to is a qualitative description in the FEIS that said, the travel management plans under various alternatives overall may have a moderate impact, and that is then the definition they repeat, which is a readily apparent change, maybe affecting character-defining features, but not impacting eligibility for the National Register. Now, what does that mean, moderate impact? They would like you to believe that means it's somehow very significant. But I'd like to point out a couple things. Most of the plaintiffs were part of a coalition that made a proposal for the travel management plan. And alternative B in the FEIS, although it may differ as to some specific segments, is the amount of mileage that they had proposed to leave open. And even that alternative would have moderate impacts. So what are we talking? I'd like to sort of put into context what is a moderate impact and what does that mean? Well, worst-case scenario, the West Pueblo ruins and the Vermilion Cliffs Monument, one of the primary roads, ones they would definitely agree is a road, has for many decades run right through the middle of the Pueblo ruins. Now, this management plan actually relocates that road off the site. But part of the point is that even though that road clipped part of the site, it never lost eligibility for the National Register because the site still has the information. And typically, archaeological sites are registered because of the information they provide about history. And the site as a whole is relatively intact. So some damage doesn't necessarily mean that a site becomes damaged to the point it's off the register. But the more typical sites that we have out there are – When you talk about damage, can you give me an example of the type of damage you're talking about? Is this a road that runs over a burial site? No, no, it's a Pueblo. It's a living site where people lived. What kind of damage are we talking about? Well, character defining. So in its original setting, you wouldn't have had a modern road through it. So it does alter in that sense. But it doesn't mean that it's not – the archaeological site is somehow no longer able to get the historic information and be excavated and so on. Typical sites, and the ones that were found in the Bungart Report that they refer to, are what are called lithic scatters. Now, what lithic scatters are, are little pieces, chips of stone that might have been – show some evidence that humans had chipped them. But they're something less than an arrowhead. And if you have a scatter in an area, that might make it an archaeological site. You have to have so many of these chips within a certain designated area. You could – you know, a visitor might pick up one of those chips, either intentionally or, you know, not knowing what it was or whatever, and walk off with it. But that site still has the information that makes it eligible for the National Historic Register because it still provides the historic information. And so – But you can't excavate below the road. Or maybe you can. Well, actually, I mean, sites don't necessarily – the desire is not to have sites all excavated because that actually damages sites itself. I mean, some of the way archaeological resources are preserved is to bury them, and if there's something in depth underneath a road, the road is not impacting it. As far as the surface of the road, keep in mind, the only designated roads were already roads and had been used for many years. And so the surface disturbance has already occurred. Although in their briefs they may be talking about on the road itself, in reality, if you read the Bungardt Report or you read the FEIS, the primary concern of impacts from travel management on archaeological sites is not the roadbed. It's the fact that you're providing – you know, that people can be there and people have – you know, may – you know, that vandals may have access or whatever. So that's the – you know, so that exists under their plan. That exists under, you know, the plan that they're challenging, the potential for impacts. Now, when they did the actual road designations, that's where, then, you look at specific sites. And there's considerable evidence that BLM did consider impacts on cultural resources. And I'll just give you a few citations to the record. For example, ER 152 in the record decision for the Parashant, BLM decided that it would not make a decision to designate 161 miles of roads until they completed some Class III inventories. So those were not designated because they're in a potential area of sites. In the Vermilion Cliffs, they found that use of an existing road would impact two sites. They – ER 193, they closed the road to Sentinel Site 1 of the roads so that roads are no longer within five-eighths of a mile. They rerouted the road that had gone through the West Bank Pueblo. And they also said that within one year, they would go out and verify the precise locations of sites that are known to be out there, but maybe haven't had the GIS coordinates that – and then they would see if the mitigation was needed. They – the route evaluation reports, you know, impacts of cultural resources is one of the issues on there. And I just want to touch on that very briefly on the route evaluation tree. First of all, this is not the same tree that we used in the district court cases on which they relied on. This was developed for this monument. It's not a generic tree. It's a, you know, one that was just for this particular resource management plan. Do you understand how it works? I mean, I've – maybe I need to spend more time with it, but I've had a hard time working my way through it. And that just may be the nature of the process. Well, here's – maybe when I – if I can describe sort of the overall process for route designation, and then answer how the route evaluation tree works. You might use the example that the plaintiff cited, and I've already lost track of it. I should have written it down. But how you get – I think it's question B. You answer yes, and so on and so forth. And I'm lost in the maze. All right. Well, in terms of their argument that the question about the cumulative effects to other resources, the non-sensitive resources like – that really aren't what we're concerned about the monument resources, but, you know, like soil or whatever. I disagree with their characterization of the route evaluation tree. There is a fork at the top, but that question is then later asked under the fork that they claim it's not asked under. And if I can tell you – if I can find the right shape of my notes here, I can tell you exactly. The question, as it goes down – okay, so a similar question to the one they say isn't asked, is actually asked under X, Z, BB, FF, HH, JJ, KK, and LL. All right? These are forks in the road, and, you know, that's – and a similar question is asked below G, which is also for those routes for which there may be sensitive impacts. But in terms of how do they do this, what – you know, if you understand how much time and effort went into these road designations, I think you could appreciate more what BLM did. They went out and they spent several years doing – with GIS equipment to locate these routes. This had not been done before. They kind of – you know, so they know exactly what's out there in terms of existing roads. They then worked as a multidisciplinary group to evaluate these roads. That means they had cultural specialists on the team. They had wildlife specialists on the team. They had, you know, soil resource people on the team. And they went through and they did this as a group, and they overlaid each route with 64 different layers of resources. So they might put on, okay, let's put over here the wilderness characteristics area. How does it impact those? Oh, we want to stay out of those. Here are the cultural resources. Here are the soils. Here are – and they – so they considered all these issues. They brought in other land management agencies who – some of them wanted to participate in this process as well. Once they went through that, then they went back through and they double-checked things. The – you know, for example, any issue that was raised in a comment, they went back and double-checked that route. They went through and double-checked routes for these cultural resources and the inventories that they went out. They went out – the Kayapai tribe asked them to look at, you know, a particular road. They went out and looked at that road and so on. So there was a great deal of care that went into this. So the route evaluation tree is simply one tool among a very long, you know, eight-year process that was used, and it's just simply to provide some prompts and some questions, but to say that it's sort of something you just fed into it and came out would not be an accurate description of how this was done. The route evaluation reports are a compilation of some data, but again, these things were looked at numerous times. And I'll just close – just touch again briefly on the wilderness characteristics issue. We think this issue has much to do about nothing, that – Do I understand correctly that basically the Bureau views the Utah settlement as – I don't want to be facetious, but it seems like it's more semantic than anything else. The Bureau's position appears to be we can do what we used to do. We just use different terminology. For Section 202 WSAs, essentially that is right. I mean, the Utah – something I want to make clear, just so it's not misunderstood. What the BLM applied here was the policy statements that followed the settlement, and they are consistent with the settlement, but obviously the Utah settlement does not apply in Arizona. But the focus of – one of the things that was accomplished for the Utah plaintiffs, the state, was that Section 603 WSAs would not be – there would not be any more designation of those, and that's not what we're talking about here. Because I think they agree that those – that process is completed. But the Section 202 WSAs, they – I think they're – those were always at BLM's discretion. Those were not part of the non-impairment standard in the statute. And so BLM was using its discretion under Section 202 to call areas wilderness study areas and giving them certain protections. Yes, the BLM now thinks that the terminology it is currently using, areas managed for wilderness characteristics, is a better reflection of the power that they're using under their Section 202 planning authority. But yes, we think it's largely a semantic difference. The other thing is when I reread the briefs, I had the impression that plaintiffs were suggesting that the 202 wilderness study area is a more secure and permanent designation than it really is. It can be changed. That was always the situation. This Court recognized that in Onda v. BLM, and I think that the analysis that was done here is absolutely consistent with what this Court said was needed in Onda v. BLM. The Court said we don't care what you call it. We need inventory for wilderness characteristics and decide whether, you know, those areas should be protected, and that's exactly what was done here. Thank you. Rebuttal. Thank you, Your Honors. The most notable aspect of that, I thought, was the admission that BLM doesn't know what holistic management means under its own plan. It really wasn't after the fact. Rationale, it appears. There's no evidence from the record that it actually shaped their decision-making. It was a phrase they came up with in response to comment when people said, hey, you're not protecting areas. They said, oh, it's holistic management. So in terms of the impacts, BLM places a lot of emphasis on the fact that, well, maybe this doesn't take away eligibility for the National Register. Well, that's a different statute with different standards. There's nothing about the National Register in the proclamation. So it's neither here nor there. But I will point out that under adverse effects, under the National Historic Preservation Act, that's 36 CFR 800.5, it talks about changes, partial or wholesale harm to objects as being an adverse effect. So that's exactly what we're talking about with the moderate impacts they tout. As for the tree, Your Honor, I sympathize. For the first time we've heard, well, maybe some questions get asked down here in this level. Again, you're going to have to dig into that appendix T to figure out what gets asked in here. I'm confident those minimization criteria don't get asked. This is an entirely new argument we're hearing. They don't get asked anyplace else either, nowhere in those route evaluation reports. And we also need to remember they actually have to implement those recommendations or those considerations. Finally, on the wilderness settlement, this is not a semantic challenge, a semantic aspect at all. Utah would be heartbroken to hear that that was so, that it got nothing out of this, out of their case. This is about what protections can be afforded these areas. And it's blatantly the case here because when the Wilderness Society said, please impose these set of management standards, and they borrowed the ones from the IMP that had been imposed in the past, the 202 WSAs. They didn't say call them 202 WSAs. They don't care what they're called. They care about the management restrictions themselves. And they said, please, just impose these restrictions. You say you can do it. You say it's semantic. And BLM's response, and they did that, by the way, at Excerpts of Record 725 to 26. And BLM's response was, we can't do it. Quote, the prescriptions were not able to be considered because their use would violate the intent of the settlement. That's at Excerpts of Record 532. This is not a semantic dispute. It's a dispute about actual management, actual management on the ground, Your Honor. And taking that alternative off the table was something they couldn't deny themselves under FLIPMA. It violated FLIPMA. It was a misinterpretation of FLIPMA. And also by taking it off the table, they eliminated consideration of a viable alternative that had been imposed a hundred times in other areas, and that's a violation of NEPA. So thank you very much, Your Honor. Roberts. Thank you. We thank both counsel for your helpful arguments. The case just argued is submitted as all the cases on today's calendar are. That concludes the argument calendar, and we're adjourned.
judges: Duffy, Clifton, Bea